UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MELBA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 05-1086 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE M. SMALL, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**

**OPPOSITION TO DEFENDANT LAWRENCE M. SMALL'S**

**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

FACTUAL BACKGROUND..................................................................... 1

ARGUMENT...................................................................................... 5

I.      Legal Standard for Summary Judgment.................................... 5

      A.  General Standard............................................................... 5

      B.  Employment Discrimination Standard................................... 5

            1.  Plaintiff's Burden..................................................... 5

            2.  Defendant's Burden.................................................. 6

            3.  Plaintiff's Burden..................................................... 6

                 a.  The Interview............................................... 6

                     (1) The Panel's Composition...................... 6

                     (2) Conduct of the Interview...................... 8

                     (3) The Panel's Scoring........................... 9

                     (4) The Panel's Recommendation............... 13

                 b.  Defendant's Attempts to Divert and Dissuade
                    Plaintiff.....................................................14

                     (1) Job Notices and Position Transfers.......... 14

                     (2) Early Shift Work and Daycare............... 15

                 c.  Defendant's Comments about African Americans.. 16

                 d.  King's Pre-selection of Kessler.........................17

                     (1) The Temporary Detail........................ 17

                     (2) The Early Work Shift......................... 18

                     (3) The New Position Description................ 19

                     (4) Professional Qualifications.................... 24

## Exhibit List

1.    Declaration of Melba Brown, dated July 3, 2006

2.    Davenport to King Email, dated March, 2004

3.    Davenport to Proctor and King Email, dated March, 2004

4.    King to Hallager Email, dated March, 2004

5.    Hallager to Davenport, King, and Stevens Email, dated March, 2004

6.    King to Proctor Email, dated March, 2004

7.    King to Proctor Email, dated March, 2004

8.    King to Proctor Email and Response, dated March, 2004

9.    Excerpts from Transcript of Robert King, taken April 6, 2006

10.   Robert King's Response to Plaintiff's Interrogatory No. 21

11.   Position Description for the Permanent Biologist Position, distributed to applicants and panel March, 2004

12.   Application Documentation Record (ROI 15)

13.   Defendant's Ex. 1, Brown's 9/29/2004 aff.(pt.3),  pp. 25- 29

14.   Affidavit of Annetta McCrae, dated October 21, 4004

15.   Defendant's Ex. 1, Brown's 9/29/2004 aff., pp. 26-28

16.   Position Description for the Temporary Biologist Position, Defendant's Ex. 1, Brown's 9/29/2004 aff.(pt.3), pp. 32-34

17.   Position Description for the Permanent Biologist Position, approved by Human Resources December 16, 2003

18.   Information from the Zoo's website on the Conservation and Science Center

19.   Melba Brown's resume

20.   Narrative Report of the Inspection Committee

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MELBA BROWN, | ) |
| Plaintiff, | ) Civil Action No.: 05-1086 (RMU) |
| v. | ) |
| LAWRENCE M. SMALL, | ) |
| Defendant. | ) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT LAWRENCE M. SMALL'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule LCvR 7(b), Plaintiff Melba Brown, by and through

counsel, respectfully requests that the Court deny Defendant's Motion for Summary

Judgment. As discussed more fully below, there are genuine disputes as to material facts,

and the Defendant is not entitled to judgment as a matter of law.

### FACTUAL BACKGROUND

Plaintiff Melba Brown is an African American female who has been employed in

the position of Animal Keeper by the Smithsonian Institution's National Zoological Park

("Zoo") since 1985. **Compl., ¶¶ 1, 8.** Plaintiff's immediate supervisor since 2000 has

been Bob King, a white male. **Ex.1, Brown Decl., ¶ 24.** His job title is Assistant

Curator or Supervisory Biologist.[1] The unit that King supervises contains the Propagation

Building, the Kid's Farm ("Farm"), and the Small Mammal House ("Small Mammal").

---

[1] It should be noted at the outset that the term "Biologist" as used in the context of the instant
lawsuit does not have its usual and ordinary meaning. Neither the Supervisory Biologist position
nor the Biologist position for which Plaintiff was an unsuccessful applicant have anything to do
with role played by a traditional biologist. Biology is defined as "the science of living organisms
and life processes, including the study of structure, functioning, growth, origin, evolution, and
distribution of living organisms." *Webster's II New College Dictionary*, 3d ed., 2005.

In April, 2003, King notified his staff that prior to finding a permanent replacement for a newly created vacancy in the unit he would appoint someone to a 120-day detail for the Biologist position at Small Mammal. **Ex.1, Brown Decl., ¶ 1.** Along with Plaintiff, David Kessler, a white male, and Angela Marlow, a white female, applied for the detail. All three applicants were interviewed in June, 2003 by a panel made up of Lisa Stevens, an African-American female, Belinda Resser, a white female, and King. **Ex.1, Brown Decl., ¶ 2.** King selected Kessler for the detail to the Acting Biologist position. **Ex.1, Brown Decl., ¶ 3.** Once Kessler began working as Acting Biologist, King told Brown that he wanted her to transfer from Small Mammal to the Farm. **Ex.1, Brown Decl., ¶ 5.** Brown, who was still interested in the Biologist position, did not agree to transfer to the Farm. Kessler remained in the detail for eight months. **Ex.1, Brown Decl., ¶ 3.**

King did not advertise for a permanent replacement for the Biologist's position until February, 2004, and competition was limited to employees within the Smithsonian Institution (Smithsonian) only. **Def. Ex. 10-B, Vacancy Announcement; Def. Ex. 2, King Aff., p 15.** As unit supervisor, it was King's responsibility to announce the vacancy. **Def. Ex. 4, Proctor Aff., p. 6, ¶19d.** In response to the February 3, 2004 job announcement for the permanent position, both Brown and Kessler submitted applications. **Ex.1, Brown Decl., ¶ 13.** Both Brown and Kessler were listed on the Application Documentation Record as "qualified" for the permanent Biologist position. **Ex. 12, Application Documentation Record (ROI 15).** Shortly after the vacancy announcement was posted, King again asked Brown if she wanted to transfer to the Farm to perform duties that did not include a promotion or salary increase. **Ex.1, Brown Decl.,**

2

¶ 8.  On February 9, 2004, King sent Brown a copy of his proposed work schedule for the Farm. **Ex. 1, Brown Decl., ¶ 10; Def. Ex. 1, Pt. 3, Brown 9/29/2004 Aff., pp. 6-7.** Brown did not agree to the transfer.

The vacancy announcement for the permanent Biologist position closed on February 18, 2004. **Ex.1, Brown Decl., ¶ 12.** The next day, King called Brown in and questioned her for a third time about transferring to the Farm.  In response, Brown told King that she had applied for the permanent Biologist position. **Ex.1, Brown Decl., ¶ 13.** On February 23, 2004, King told Brown that the person who got the Biologist position would be required to work an earlier shift, and he questioned whether she would be able to work the earlier shift due to what he characterized as her daycare issues. **Ex.1, Brown Decl., ¶ 14.** At the time, Brown's daughter was four years old. *Id.* Brown learned from King that she and Kessler were the only two applicants whose names were placed on the certification list as being eligible to apply for the position. **Ex.1, Brown Decl., ¶ 15.**

On February 24, 2004, Brown asked King for clarification about the shift hours for the permanent position.  King told Brown that if she could not work the earlier shift, she would not be considered for the position and there was no need for her to go any further in the application process. *Id.* Later that same day, King approached Brown and said that he now wanted to detail her to the Biologist position.  Thus, he could throw out the current certification list, re-announce the permanent position, and open the competition up to applicants outside the Smithsonian.  King then told Brown that if she were detailed to the Biologist position the same terms of employment would apply, that is, she would have no option about working the earlier shift; and he now added that she also would be required to stay late some nights.  During his detail, Kessler had not been

3

required to stay late. **Ex. 1, Brown Decl., ¶ 16.**

On March 8, 2004, King told Brown that she would be interviewed for the Biologist position by a panel made up of Lisa Stevens, an African-American female, Sara Hallager, a white female, and Michael Davenport, a white male. King and his two white male supervisors, Bill Xanten and Jack Grisham, wrote the fifteen questions the interview panel members were to ask. As supervisor for the unit, King had complete discretion over the selection of panel members and complete discretion over the final selection to fill the position. **Def. Ex. 4, Proctor Aff., pp. 3, 5-6, ¶¶ 11d, 21.**

The day before Brown's March 11, 2004 interview, King sent Brown and Kessler a copy of the position description for the Biologist position at Small Mammal. **Def. Ex. 2, King Aff., pp. 25-32.** Two days earlier King had sent the same position description to panel member Davenport. **Ex. 2, Email between King and Davenport.** Immediately before Brown's interview, King went in to speak to the panel first. Kessler was interviewed by the panel on March 12, 2004, and King selected him for the permanent position that same day. **Def. Ex. 10-A, Referral Certificate for Federal Position.** Brown was not notified about the final selection until March 22, 2004. **Ex. 1, Brown Decl., ¶ 21; Def. Ex. 2, King Aff., p. 35; Def. Ex. 1, Pt. 3, Brown 9/29/2004 Aff., p. 22.** When she asked King the basis for her non-selection, he told her that the panel, not he, had made the decision. She was told that she should seek an explanation from Lisa Stevens and, if she liked, the other panel members. Brown sent inquiries to all three panel members. **Def. Ex. 1, Pt. 3, Brown 9/29/2004 Aff., pp. 19-21.** Lisa Stevens was the only panel member to reply. **Ex. 1, Brown Decl., ¶ 21; Def. Ex. 1, Pt. 3, Brown 9/29/2004 Aff., p. 23.** Panel member Davenport was in a quandary, and King told panel

member Hallager not to reply.  **Ex. 3, Email between Davenport, Proctor and King; Ex. 4, Email between Hallager and King.**

## ARGUMENT

### I.     Legal Standard for Summary Judgment

#### A.  General

The procedure for granting summary judgment in a civil action is controlled by Fed. R.. Civ. P. 56(c), which states that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The party requesting summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is a fact the resolution of which "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  It is well established that the jury alone makes factual determinations.  "[T]he court is not to make credibility determinations or weigh the evidence."  *Dunaway v. Int'l. Brotherhood of Teamsters*, 354 U.S. App. D.C. 36, 310 F.3d 758, 761 (D.C. Cir. 2002).

#### B.  Employment Discrimination

##### 1. Plaintiff's Burden

The law regarding the requisite standard of proof for establishing a viable claim of employment discrimination under Title VII as set out in Defendant's motion for

summary judgment is correct in most aspects. However, Plaintiff disagrees with the

contention that because the position at issue in this case was vacant, her case is a failure

to hire, rather than a failure to promote, case. **Def. Mot. at 12.** In any event, Defendant

concedes that "Plaintiff has clearly established a *prima facie* case of race and sex

discrimination." **Def. Mot. at 13.**

### 2. Defendant's Burden

Defendant contends that its legitimate, non-discriminatory reason for the non-

selection of an African American female applicant and selection of a white male

applicant is that selecting official King merely followed the unanimous

"recommendation" of a neutral racially and gender mixed panel that had posed the same

fifteen job-related questions to both applicants. **Def. Mot. at 14.**

### 3. Plaintiff's Burden

As will be discussed more fully below, Defendant's proffered reason is a

fabrication and a subterfuge for disguising King's actual discriminatory actions.

### a. The Interview

#### (1) The Panel's Composition

Defendant makes much of the fact that the interview panel for the

permanent Biologist position consisted of a white male, a white female, and an African

American female. This was the same type of arrangement that King had used for the

interview panel that was convened eight months earlier to interview Brown and Kessler

for the Small Mammal Biologist temporary detail. Clearly, this is King's preferred

employment panel configuration, though not necessarily for reasons of fairness. King

believed that the ploy of including a representative of both genders, along with a

6

representative of Brown's race, would successfully stave off any claims of gender and/or race discrimination. In a moment of candor, King had confided to Brown that in matters involving race, Zoo management regularly relied on Stevens who was, and remains, their only African American female employed in animal management. **Ex. 1, Brown Decl., ¶ 9.** Stevens herself claims that she has "served on more than three panels" and that she has done so "frequently to add diversity to the panel [because she is] the only African American curator and also for many years was the only female curator." **Def. Ex. 3, Stevens Aff., pp. 1-2, ¶¶ 11a, 11b** Defendant's claim that Stevens hired Plaintiff is a bit of an exaggeration. Stevens was a member of the hiring panel that interviewed Plaintiff 25 years ago for the Animal Keeper position that Plaintiff still occupies. *Id.* **at ¶ 11a**.

Defendant's suggestion that the interview panel for the permanent Biologist position was free of gender and/or racial animus because it contained members of Plaintiff's gender and race is baseless and simplistic. There is no basis for assuming that racial animus is confined to persons outside of an applicant's racial group. Racism is not rational. Similarly, there is no basis for assuming that gender bias is confined to persons outside of an applicant's gender. The one common factor in the three positions that Brown applied for at the Small Mammal House and was denied was Stevens.

Specifically, in 2000 both Brown and King applied for a one-year detail as Assistant Curator for the Small Mammal House. Stevens, without interviewing Brown, interviewed King and selected him for the detail. King remained in the detail until 2002 when he was appointed to the permanent Assistant Curator position. . **Def. Ex. 1, Brown 9/29/2004 Aff., p. 25, a copy of which is attached hereto as Pl. Ex. 15.** In June 2003, Stevens was a member of the interview panel that King says selected Kessler over Brown

for the Biologist temporary 120- day detail that lasted eight months.  In February, 2004, Stevens was a member of the interview panel that King says recommended Kessler over Brown for the permanent Biologist position.  Stevens' statement suggests that she enjoys her "status" as the Zoo's sole African American female working in animal management, and she may, in fact, be inclined to racially discriminate against an applicant who threatens her unique position in the Zoo's managerial hierarchy.

### (2)  Conduct of the Interview

King's claims that several weeks before the interview he began asking for the panel's input on the interview questions and that he worked hand-in-hand with the human resources specialist to develop unbiased questions are gross factual misstatements. On March 8, 2004, three days only before Brown's interview, King first asked panel members for "suggested interview questions."  **Ex. 2, Email between King, Davenport, Stevens, and Hallager.**  Contrary to Defendant's claim, Davenport submitted no suggestions.  Rather, three days before the interview he was desperately seeking some guidance in the form of a job description or a list of duties.  *Id.*  Hallager suggested one question, but it was not included in the interview.  **Ex. 5, Email between King and Hallager.**

Three days before Brown's interview, King still did not have a final list of interview questions.  **Ex.6, Email between King and Proctor**.  King did not send his list of interview questions to Scarlitt Proctor, the human resources specialist, for her review until March 10, 2004, or the day before Brown's interview.  **Ex. 7, Email between King and Proctor**. Defendant has produced no record of a response from Proctor.  A little after 9:00 a.m. on the morning of Brown's 9:45 a.m. interview, King sent two additional

8

interview questions to Proctor for her review. **Ex. 8, Email between King and Proctor**. Proctor did not respond until 10:37 a.m., which was well after Brown's interview was under way. The sum total of Proctor's belated expert input was "Looks good!" *Id.*

Finally, King made an unexplained call on the panel members immediately prior to Brown's interview, and Stevens disrupted Brown's interview and left the room to talk to Kessler allegedly about rescheduling his interview. **Ex.1, Brown Decl., ¶ 18.** Stevens also told Brown that she had somewhere to go. **Def. Ex. 5, Brown Rebuttal Aff., 11/08/2004, p. 4.**

### (3) The Panel's Scoring

The panel members' evaluation of the applicants' responses was completely arbitrary and subjective. Defendant relies on Stevens' subjective claim that Brown "failed to answer questions as thoroughly." **Def. Mot. at 6.** Defendant has not explained "as thoroughly" as what Brown's answers should have been. Brown was interviewed and rated a full day before Kessler was. So, Stevens could not possibly have meant that at the time that she was rating Brown's responses, Stevens knew that Brown's answers to the questions were not as thorough as Kessler's would be. Stevens' claim that Brown "did not provide a complete or as well thought plan for the future of the Small Mammal Unit" is equally baseless. *Id.* Again the question is as well thought a plan as what? As Kessler was not interviewed until after Brown was interviewed and rated, his response could not be the basis of comparison, that is, unless Brown's answers were not assigned a score until after Kessler's interview. Furthermore, it is the Assistant Curator, and not the Biologist, who is responsible for developing a plan for the unit's future. **Def. Ex. 5, Brown Rebuttal Aff., 11/08/2004, p. 4.** Otherwise, there would be no need for an

9

Assistant Curator. Davenport's claim that Brown's answers were "not as good as those of the other candidate" is equally vague. **Def. Mot. at 6.** Davenport has failed to explain why Brown's answers were not considered as good.

Hallager's claim that Brown "was unable to satisfactorily answer many of the questions" is undermined by her admission regarding her own inability to answer all of the questions. **Def. Mot. at 6; Def. Ex. 1, Brown 9/29/2004 Aff., p. 29, a copy of which is attached hereto as Pl. Ex. 13.** Hallager also has failed to elaborate on why Brown's answers were considered less than satisfactory. Hallager's claim that Kessler "was clearly the more qualified applicant based on his responses to the questions." is subjective as well as inaccurate. Both Brown and Kessler were rated as qualified. Notably, neither applicant was rated as highly qualified or best qualified. **Ex. 12, Application Documentation Record (ROI 15)**. In this Circuit, employer explanations that rely too heavily on subjective, rather than objective, considerations warrant closer scrutiny. *Kalinoski v. Gutierrez*, 2006 U.S. Dist. LEXIS 32922, at *39 (D.D.C. May 25, 2006) (citation omitted).

Moreover, the pseudo-objective technique that was employed of rating each answer on a scale of 1 to 5 was a farce. For example, question numbered 6 stated "Briefly explain the evolutionary tie between a ruffed lemur and a howler monkey. Use physical characteristics to compare and contrast these two animals." First, there are at least "50 different species representing about 350 animals" kept at the Small Mammal House, and among the group there are two ruffed lemurs and 2 howler monkeys only. **Ex. 9, King Depo., 22:12-21; Ex. 1, Brown Decl., ¶ 19.** Defendant is completely at a loss to explain the correlation between such a question and the position that was being filled. One of

10

Plaintiff's interrogatories propounded to Defendant stated:

> For every question the interview panel asked plaintiff during the interview that was conducted for the Biologist position that plaintiff was denied in March, 2004, describe in detail the correlation between the question asked and the duties and/or responsibilities for the Biologist position that was the subject of the interview.

**Ex. 10, Def. Interrog. Resp. No. 21.**  King responded:

> relates to the knowledge required by the position as follows: Position requires a working knowledge of the principles of conservation and management of wildlife in a captive setting, ecology and natural history of small mammals.  Must be able to apply these biological facts, principles, methods, techniques and procedures to the management and exhibition of husbandry and population management.  Position requires the understanding of, and ability to communicate (through exhibits and education programs) the concept of the interdependence of life.  A demonstrated knowledge of all aspects of daily care for exotic captive animals along with the understanding of how to apply this knowledge for successful management are prerequisites. Incumbent must be able to assist in conducting research programs, both pure and applied, and be able to conduct all procedures and coordinations [sic] with other departments of the NZP on an independent and self-directed basis. Computer literacy is required.  Incumbent must be able to conduct all aspects of the supervision of a volunteer program, including development of a volunteer staff and relationship with FONZ.

*Id.*  This woefully inadequate and non-responsive reply was obviously lifted verbatim from the section of King's new Biologist position description titled "Factors –

1. Knowledge required by the position" **Def. Ex. 2, King Aff., pp. 28-9; Ex. 11, Position Description for GS9/11 Biologist.**[2]  Indeed, Defendant has failed to provide a cogent explanation for any of the fifteen questions that were posed during the interview. Language from the Biologist position description, whether applicable or not, was merely lifted straight from the description's text. **Ex. 10, Def. Interrog. Resp. No. 21.**

Second, there was no objective standard by which to assess or evaluate the

---

[2] Because the quality of the copy that was included in the Report of Investigation (ROI) is so poor, Plaintiff has reproduced the position description in full as her Exhibit 11.

applicants' verbal responses. The Defendant has provided no list of correct answers or any evidence that such information was provided to the panelists. None of the panelists had hands on experience working with the animals in the Small Mammal House, and it is questionable whether all, or any, of the panel members was qualified to rate the responses to the questions posed. Both Hallager and Davenport told Brown during the interview that they could not have answered some of the questions that were asked. **Def. Ex. 1, Brown 9/29/2004 Aff., p. 29, a copy of which is attached hereto as Pl. Ex. 13.** Davenport, who works with reptiles, rated Brown's response to the sixth question as 2 and Kessler's response as 4. **Ex. 9, King Dep., 23:8-14; Def. Ex. 10-D, p. 3; Def. Ex. 10-E, p. 7.** Hallager, who has no science degree at all and works in the bird house, rated Brown's response to the same question as 3 and Kessler's response as 4. **Ex. 9, King Dep., 23:21-25:2; Def. Ex. 10-D, p. 7; Def. Ex. 10-E, p. 11.** Stevens, who works with primates and pandas, rated Brown's response to the question as 2 and Kessler's response as 4. **Ex. 9, King Dep., 21:19-21; Def. Ex. 10-D, p. 11; Def. Ex. 10-E, p. 3.**

Furthermore, Defendant's contention that the panel members took copious notes of the responses given during the interviews is meaningless. Defendant has no record of Brown's and Kessler's actual responses. Defendant has only a record of what the three panel members elected to write down. The panel members' notes may appear copious to Defendant, but it does not necessarily follow that said notes are complete, or even accurate. Brown was told by some of the panel members that they had run out of room to write her responses on the cramped form that King had provided. **Ex. 1, Brown Decl., ¶ 18.** Also, Brown noted that Stevens was not always writing while Brown was responding to a question. *Id.*

12

There is also an issue concerning whether the panel was using the correct criteria for evaluating the candidates.  King's impermissible introduction of Grade GS-11 factors into the panel's consideration of the applicants will be discussed below under the discussion of Kessler's pre-selection for the permanent Biologist position..

### (4)  The Panel's Recommendation

In response to the filing of Plaintiff's administrative complaint, King claimed that he told his superiors, as well as the three panel members, that he would act in accordance with the panel's decision.  **Def. Mot at 5.**  However, neither of King's superiors or any of the three panel members who were interviewed has submitted sworn testimony substantiating that claim.  There is no evidence that King told the applicants that he would be following the panel's recommendation, or even that the panel would be making a recommendation.  Also, no written recommendation from the panel has been produced; and if there was a verbal recommendation, the record is silent as to when any such recommendation was allegedly made.  Defendant admits that it cannot state what the qualifying factors were that resulted in Brown's non-selection compared to the qualifying factors of Kessler because there "is no documentation explaining why Ms. Brown was not selected."  **Def. Ex. 4, Proctor Aff., pp. 7-8, ¶ 26.**

The truth of the matter is that irrespective of how the interview panel rated the applicants, King as the unit manager was free to select either candidate for the position. In short, King had nothing to lose by going through the motions of convening a panel of allegedly neutral decision makers.  If Kessler obtained a higher score from the panel, that would be all well and good.  However should Brown somehow obtain a higher score than Kessler, King was still free under Smithsonian policy to make his own final selection.

13

**Def. Ex. 4, Proctor Aff., pp. 6-7, ¶ 21h.**

    b.  **Defendant's Attempts to Divert and Dissuade Plaintiff**

      **(1) Job Notices and Position Transfers**

It is undisputed that King persistently questioned Brown about transferring to the Farm to work with newly assumed duties for the same salary and that he repeatedly gave Brown notices of jobs that were outside the Zoo. **Ex. 1, Brown Decl., ¶¶ 5, 6, 7, 8, 10, 13, and 22; Def. Mot. at 18-19.** King now attempts to explain and justify his discriminatory actions by claiming that he was attempting to help Brown "foster her expressed interest." **Def. Mot. at 18.** Yet the one position that King knew Brown wanted more than anything, he failed to tell her about. Brown had certainly expressed her interest in the Biologist position. Even though he had personally prepared and submitted the vacancy announcement, King never advised Brown that the vacancy announcement for the permanent Biologist position at the Small Mammal House had been posted, and he never offered her a copy of that job notice. **Ex. 1, Brown Decl., ¶ 7.** The fact that Brown did not tell her supervisor that she was "put off by his actions" does not render King's behavior any less discriminatory. An employee should not have to tell her supervisor to stop giving her job notices for jobs elsewhere.

King finally admits that before Brown was interviewed for the permanent Biologist position, he impermissibly questioned her about daycare arrangements and whether she would be able to work the earlier 6:30 a.m. to 3:00 p.m. shift. The feeble explanation now being offered to explain his blatantly sexist actions is that he wanted to make sure that she knew the new work hours and that she did not waste her time going through a needless interview and selection process. **Def. Mot. at 18.** Curiously, King

was not concerned eight months earlier about Brown wasting her time by going through a sham interview for the 120-day temporary Biologist detail. King claims that Kessler was selected for the temporary detail because he alone of the three applicants had not had the opportunity to "develop or acquire administrative skills" outside of his normal duties. **Def. Mot. at 19-20.** If that is true, it was just as true before the interview. Therefore, there was no need for King to waste Brown's and the other female applicant's time by having them go through an interview.

### (2) Early Shift Work and Daycare

King has vacillated in his response to Brown's assertion that he impermissibly questioned her about day care and whether she would be able to work the earlier shift. During the administrative investigation of Brown's complaints, King was asked "Did you question Ms. Brown about her application for the Biologist position?" King responded, in part, by stating that "Prior to an interview, I asked Ms. Brown if she would be able to work the specific hours that the Biologist position required. She did not answer and I later heard . . . that she felt that my questioning had been improper – so I did not follow up on it."

Plaintiff's Complaint alleges that "Before the March 11, 2004 interview plaintiff's supervisor questioned her about the daycare arrangements for her child and her ability to work early shifts." **Compl., ¶ 12.** Defendant's answer to the Complaint states, "Admit that prior to the interview on March 11, 2004, Mr. King asked plaintiff if she would be able to work the hours that the biologist position required, specifically starting at 6:30 AM. *Deny that Mr. King questioned plaintiff about her daycare arrangements for her child.*" **Def. Answer, ¶ 12**. (emphasis added). Indeed, King did not admit his having

15

asked Brown whether her child's daycare would be problematic until his deposition testimony was taken. **Ex. 9, King Dep., 37:11-38:13, 39:17-19.** It is important to note that King did not question Brown once and stop. He knew that she was a single mother, yet he repeatedly badgered her and told her there was no need for her to go any further in the application process if she was unable to work the earlier 6:30 a.m. to 3:00 p.m. shift. **Ex. 1, Brown Decl., ¶¶ 14-16; McRae 10/21/2004 Aff., p. 2, ¶ 14, p. 5, ¶¶ 21-2(ROI Ex. 10).**

### c. Defendant's Comments about African Americans

Other than stating that there was a strict policy against discrimination, King was unable at deposition to express even the most rudimentary understanding of his employer's anti-discrimination policy or what actions should be taken to prevent workplace discrimination. **Ex. 9, King Dep., 14:18-15:4.** Yet, the Smithsonian has distributed to its supervisory staff information that specifically addresses illegal workplace harassment based on race, gender, or parental status. **Def. Ex. 1, Brown 9/29/2004 Aff., pt.3, pp. 26-28, a copy of which is attached hereto as Pl. Ex. 15.**

King introduced the topic of Brown's race during one of his frequent attempts to convince her to voluntarily transfer from the Small Mammal House to the Farm. **Ex. 1, Brown Decl., ¶ 8; Def. Ex. 1, Brown 9/29/2004 Aff., p. 27, a copy of which is attached hereto as Pl. Ex. 13.** King told Brown that because he was unable to effectively communicate with African Americans and because she was his only African American staff member he could use her at the Farm to reach other African Americans. *Id.* King even suggested that Brown could review the draft of a letter he proposed to write to black newspapers to determine if his letter was effective in reaching African Americans. *Id.* In

short, King assumed that because Brown is an African American she would be willing to listen to his insulting remarks about his inability to communicate with members of her race. It was during this same conversation that King told Brown about the Zoo management's practice of using Stevens as a shield in issues involving race. . **Ex. 1, Brown Decl., ¶ 9; Def. Ex. 1, Brown 9/29/2004 Aff., p. 27, a copy of which is attached hereto as Pl. Ex. 13.** Also, whether it was true or not, King held over Brown's head the fact that Zoo management was not unmindful of her former active role as spokesperson for a group of African American employees at the Zoo. **Ex. 1, Brown Decl., ¶ 11.**

### d. King's Pre-selection of Kessler

#### (1) The Temporary Detail

Defendant's contention that King's selection of Kessler for the temporary Biologist detail is unconvincing. **Def. Mot. at 20.** In fact, Kessler's temporary detail, which lasted eight months, was key in the implementation of King's planned pre-selection of his candidate of choice as the next permanent Biologist at the Small Mammal House. As noted above, if the real purpose of detailing Kessler to the position was so that he could gain administrative skills, there was no need for King to subject the two female applicants to a sham interview. King knew before an interview was scheduled what the respective backgrounds of all three of his employees were. King's insistence that the temporary detail would not give Kessler an advantage in obtaining the permanent Biologist position was small comfort to Brown. **Ex. 1, Brown Decl., ¶ 4.**

Furthermore, it is a complete falsity that Kessler had not previously been afforded an opportunity to acquire administrative skills. While employed at the Zoo, Kessler had participated in the exact same type of management training that King had. King testified

at deposition that, "I have taken several professional zoo management courses, have completed the AZA which is the accreditation association. They have a two-year leadership management-type class, and I have completed that . . ." **Ex. 9, King Dep., 12:8-16**. King went on to explain that the training was not for a continuous two-year period but rather consisted of his obtaining one week of training for two consecutive years. *Id.* **at 13:14-14:17.** Kessler represents as part of his educational credentials that he attended the "AZA School for Professional Management Development for Zoo and Aquarium Personnel" for the years 1993 and 1994. **Def. Ex. 10-C, Kessler Application, p. 9.** Thus, Defendant's proffered non-discriminatory reason for Kessler's selection to the temporary detail is a pretext. The real reason was to give Kessler, a white male, the inside track on the permanent position.

King's next move was to attempt to get Brown out of the way. He regularly supplied her with job announcements for positions outside the Zoo and he tried unsuccessfully three times to get Brown to transfer from the Small Mammal House to the Farm. **Ex. 1, Brown Decl., ¶¶ 5, 6, 8.** Having stretched what was supposed to be a three-month temporary detail to eight months, King finally took steps to have the position permanently filled, but never bothered to give Brown a copy of that job notice.

### (2) The Early Work Shift

When King learned that Brown was in contention for the permanent Biologist position, he began a campaign of bullying and intimidation that was meant to force Brown into withdrawing her application. Defendant's claim that King merely wanted Brown to know that the new position required a mandatory earlier work shift is disingenuous. King insisted to Brown that if she obtained the permanent position or if he

decided to put her in a temporary detail and re-announce the position, she would have to work the earlier 6:30 a.m. to 3:00 p.m. shift as well as stay late on demand. **Ex. 1, Brown Decl., ¶¶ 15-16.** Defendant concedes that King knew Brown was the mother of a young child and had been working the 8:00 a.m. to 4:30 p.m. shift. **Def. Mot. at 4, 18.** The Supreme Court recently stated in a Title VI unlawful retaliation case that, "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Burlington Northern v. White*, No. 05-529, 2006 U.S. LEXIS 4895 at *29 (June 22, 2006).

Both the vacancy announcement and the position description for the Biologist position have a section titled "Working Conditions." Notably, both documents are silent on the hours of work. However, King tried his best to get the requirement for a mandatory 6:30 a.m. to 3:00 p.m. work shift put into writing. When King sent Proctor an email with interview questions the day before Brown's interview, he wrote, "Also, I haven't given the applicants a copy of the PD [position description] as I am waiting to see if you think it would be advisable or OK to add language indicating the requirement to work specific shifts. If I don't hear back before 2 today, I will go ahead and give it to them as is." **Ex. 7, Email between King and Proctor.** Thus, Defendant's proffered non-discriminatory reason for questioning Brown about her ability or willingness to work an earlier 6:30 a.m. shift is a pretext. The real reason was to impermissibly force Brown to withdraw from the competition for the permanent Biologist position.

### (3) The New Position Description

Defendant's claim that King "revised and updated the [Biologist, Small Mammal House] position description to reflect the significant change in scope and role that the job

19

would serve . . ." is insupportable. **Def. Mot. at 3**. There is no change in the scope and role that the job of the Biologist, Small Mammal House serves, and King did not revise or update the 15-year old position description. As will be shown, what King actually did was move a phrase or two around, add four new general sentences, and insert three new sentences that were explicitly tailored to address what King perceived as Kessler's strength in science research. King did not eliminate one word from the former position description. He did not even change the paragraph numbering.

The former position description was used in June, 2003 for the 120-day temporary detail. It is captioned "GS 9/11 Biologist – Small Mammal House (120 Day Detail)." **Def. Ex. 1, Brown 9/29/2004 Aff., pt. 3, pp. 32-34, a copy of which is attached hereto as Pl. Ex. 16.** According to the position description cover sheet, King submitted the completed new position description in November, 2003, and Proctor in Human Resources ("HR") signed off on it on December 16, 2003. **Ex. 17, Position Description, p. SI-0053.** The permanent position was advertised and filled at the grade GS-9 level, with promotional potential to the grade GS-11 level. *Id.* **at SI-0053 to SI-0054.** It is undisputed that the permanent position was advertised only at the grade GS-9 level and that Kessler was appointed to the permanent position at the grade GS-9 level but has since been promoted to the grade GS-11 level. **Ex. 17, p. SI-0054, Ex. 9, King Dep., 17:16-18:17.**

The following differences between the position description that was approved by human resources and the position description that King distributed to the applicants and to panel member Davenport are noteworthy:

(a) The caption on the HR approved new description reads "GS-9

20

Biologist (Small Mammals)." **Ex. 17, p. SI-0055.** The caption on the distributed copy reads "GA 9/11 Biologist (Red highlighted sections apply to GS 11 only)". **Ex. 11, p. 1.**

(b) To the former description, King added the last sentence of the second paragraph under the heading "Introduction." **Exs. 16-17, 11.** The sentence, which was approved by HR, is highlighted in blue on Pl. Ex. 11.

(c) To the former description, King added the third sentence in the first paragraph under the heading "Major Duties." *Id.* The sentence, which was approved by HR, is highlighted in blue on Pl. Ex. 11.

(d) In the first line of the second paragraph under the heading "Major Duties," King added to the distributed copy the words "volunteer (keeper aide and interpreter) and." *Id.* These words, which are not in the HR approved description, are highlighted in red on Pl. Ex. 11.

(e) To the former description, King added the third paragraph under the heading "Major Duties." *Id.* The one-sentence paragraph, which was approved by HR, is highlighted in blue on Pl. Ex. 11.

(f) The last paragraph as well as the text that King added to the beginning of the sixth paragraph under "Major Duties" is not contained in the HR approved description. *Id.* It is highlighted in red on Pl. Ex. 11.

(g) To the former description, King moved, but maintained, the last sentence in the paragraph titled "Knowledge required by the position." *Id.* He then added two additional sentences that are not in the HR

21

approved description. *Id*.  The new text is highlighted in red on Pl. Ex.
11.  These are the two crucial sentences that were directly aimed at
accentuating Kessler's alleged science research acumen.

(h)  Finally, King, with HR approval, added the last sentence to the
paragraph titled "Guidelines."

First, it is questionable whether King had the authority to distribute a position
description that differed in content from the description that had been approved by H R..
Next, it is not known whether the copies that were sent to Davenport or any other panel
member actually showed the additional text in red, and not black, script.  The black and
white copy that Brown received did not show any red text. **Ex. 16**.  The importance of the
inclusion of the additional red text cannot be overstated.  King, apparently without
authority, had introduced a job factor that stressed research capabilities.  According to the
position description's caption, however, the text that was red-highlighted was meant to
apply to the grade GS-11 grade only, and not to the entry level grade GS-9.  At this point,
there is no way to determine whether panel members who read King's tailor-made
description were improperly influenced into thinking that the research capability he
added was an integral part of the grade GS-9 position for which they were interviewing.
It was not.

The notion that an institution as renowned and prestigious as Washington's
National Zoo would depend on its next to lowest level workers in its animal management
units to conduct its research is absurd.  Even the very position description that King was
distributing clearly states in the introduction that the Zoo has scientists who "work at the
Zoo, as well as at the 3,150-acre Conservation and Research Center in Front Royal, Va.

22

and in the field." **Ex. 11**. The Conservation and Research Center has an elaborate

program and a huge staff of highly trained graduate students and skilled scientists who do

not have to split their time between conducting pure research and physically taking care

of the animals in the Zoo's collection. **Ex. 18**.

In sum, there was no third key element of the Biologist job that Kessler's alleged

"extensive research and published journal experience" addressed. **Def. Mot. at 4**  King

simply said there was. Thus, Defendant's proffered non-discriminatory reason for

claiming that Brown's superior science education skills were "indisputably offset by Mr.

Kessler's advantage in pure science" is a pretext.  The real reason that King wanted to

emphasis Kessler's alleged superior research skills was to impermissibly place the pre-

selected candidate of his choice in the light most favorable.  To achieve his goal, King

went so far as to construct a false third element to the Biologist position.  Even if such an

element is considered part of the advanced grade GS-11 level position, the position that

Brown and Kessler applied for, and for which the panel interviewed, unmistakably did

not include a science research element.

If, in fact, King believed that both candidates had almost equal experience in

animal husbandry and Brown had superior science education skills, Brown should have

been selected for the position because Kessler had no unique or special skill that was

applicable to the entry level grade GS-9 position that was advertised.  The science

element that King added to the position description applied to the advanced grade GS-11

level only.  Defendant cannot lawfully advertise a position for one grade level, then

interview and evaluate applicants using criteria for a higher grade level.  Defendant's

claim that King did not pre-select Kessler for the disputed Biologist position has a hollow

23

ring. On February 12 and 13, 2004, the Accreditation Committee conducted a follow-up

inspection at the Zoo. In the listing of Zoo staff with whom the inspection team members

met, the name "David Kessler, Biologist, Small Mammal Unit" appears[3]. **Def. Ex. 1,**

**Brown 9/29/2004 Aff., pt.3, p. 9, a copy of which is attached hereto as Pl. Ex. 20.** The

vacancy announcement for the permanent Biologist position would not close until

February 18, 2004, and the panel's interviews would not take place for another month.

Quietly, Kessler had already assumed his new position.

### (4) Professional Qualifications

Plaintiff has just a brief word concerning Defendant's repeated suggestions that

Kessler somehow has professional qualifications that are superior to her qualifications.

He does not. The only degree that both Brown and Kessler hold is an undergraduate

college degree. Kessler's bachelor's degree is in biology while Brown's is in zoology,

the actual biological science that deals with animals. **Def. Mot. at 17.** Understanding and

appreciating the importance of living plants to the quality of life for animals, especially

those living in captivity, Plaintiff has taken and completed classes in horticulture at the

USDA Graduate School. **Ex. 19, Pl. Resume.** Defendant attempts to make much of the

alleged fact that Kessler "has completed graduate coursework towards a Ph.D." Kessler

does not have his doctorate, or even his masters. According to his own resume, Kessler

completed only four substantive science courses in two years. **Def. Ex. 10-C, p. SI-0019.**

A failed attempt to obtain a graduate degree twenty years ago is not a credential.

### CONCLUSION

Defendant has offered its legitimate non-discriminatory reasons for Brown's non-

---

[3] Note that other staff members who were functioning in an acting capacity indicated that fact,
e.g., Terri Cornetto, Acting Nutritionist.

selection.  This Circuit has held that,

> "At this point, 'to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.' . . . By 'all of the evidence,' we mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence that plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." (citing *Aka v. Wash. Hosp. Ctr.*, 332 U.S. App. D.C., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)(internal citations omitted).

*Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).  Because Brown has shown that

a reasonable jury could conclude from all of the evidence that King's non-selection of her

and selection of Kessler for the permanent Biologist position was made for a

discriminatory reason, Defendant Lawrence M. Small's Motion for Summary Judgment

should be denied; and this matter should be set down for trial.

                                Respectfully submitted,
                                HOUSTON & HOWARD

                        By:     *Barbara E. Brown*
                                Barbara E. Brown, #321091
                                1001 Connecticut Avenue, NW
                                Suite 402
                                Washington, D.C. 20036
                                (202) 628-7058

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Plaintiff's Memorandum of

Points and Authorities in Opposition to Defendant Lawrence M. Small's Motion for

Summary Judgment, Statement of Material Facts in Dispute, and proposed Order, was

served through this Court's electronic filing system this 5th day of July, 2006 to:

> Alan Burch
> Assistant United States Attorney
> 555 4th Street, NW
> Washington, D.C. 20530
> Alan.burch@usdoj.gov

*Barbara E. Brown*

Barbara E. Brown

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MELBA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 05-1086 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE M. SMALL, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS A GENUINE ISSUE**

Pursuant to Local Rule LCvR 7.1(h), Plaintiff Melba Brown by and through

counsel, submits the following Statement of Material Facts As to Which There Is A

Genuine Issue:

1.      To give the appearance of fairness, the Zoo management regularly used

Stevens on panels. **Ex. 1, Brown Decl., ¶ 9.**

2.      The fact that Kessler was selected in June 2003 over Brown for the

temporary detail to the Biologist position gave Kessler a huge advantage over Brown in

obtaining the permanent position.  There was no valid reason for selecting Kessler based

on a lack of administrative training because Kessler did, in fact, have administrative

training prior to his appointment in June, 2003 to the temporary detail. **Def. Ex. 10-C,**

**Kessler Application, p. 9.**

3.      The permanent grade GS-9 Biologist position did not have three key

elements.  In fact there was no key element involving 'strong biological science including

research and professional publications."  Therefore, even if Kessler has a strong science

research background, it should not have been considered because no such skill was required for the GS-9 position. **Ex. 11, 16, 17.**

4.      King made repeated attempts to convince Brown to transfer from the Small Mammal House to the Farm. **Ex. 1, Brown Decl., ¶¶ 5, 8, and 13.**

5.      King initially denied asking Brown about her daycare arrangements when he was inquiring whether she would be able to work a mandatory earlier 6:30 a.m. to 3:00 p.m. shift. **Ans. to Compl., ¶ 12.**

6.      Panel member Hallager does not have a science degree. **Ex. 9, King Dep., 23:21-25:2.**

7.      Panel members Hallager and Davenport told Brown that they could not answer some of the questions. . **Ex. 1, Brown Decl., ¶ 9.**

8.      King did not work with the interview panel to develop the interview questions. King was still making up questions on the morning of Brown's interview.

9.      King got no input from Proctor on the last two questions that he added because Proctor did not respond to his email request until one hours after Brown's interview had begun. **Ex. 8**

10.     King was completely unable to articulate how the fifteen random questions he made up were related to the position for which Brown interviewed. **Ex. 10, Def. Interrog. Resp. No. 21**

11.     There is no permanent record of Brown's and Kessler's responses to the interview questions. There is only a record of what the panel members elected to write down. **Def. Ex. 4, Proctor Aff., PP. 7-8, ¶ 26.**

12.     Brown noticed that Stevens was not always writing when she was

responding to an interview question. .  **Ex. 1, Brown Decl., ¶ 18.**

13.    The interview panel did not produce a written recommendation.  Even if the panel made a recommendation, King was not obligated to follow it.  **Def. Ex. 4, Proctor Aff., pp. 6-7, ¶ 21h.**

14.    King added text to the new position description after it had been approved by Human Resources.  King distributed his version of the position to the applicants and the panel. **Ex. 11, 16, and 17.**

15.    King's version of the position description was misleading in that it contained factors that related to the grade GS-11 level position. **Ex. 11, 16, 17.**

16.    King told Brown that he could not effectively communicate with African Americans and asked if she would review a letter that he proposed to write to black newspapers.  **Ex. 1, Brown Decl., ¶ 9.**

17.    King told Brown that Zoo management would never change its mind about her.  **Ex. 1, Brown Decl., ¶ 11.**

18.    Kessler had assumed the title "Biologist, Small Mammal Unit" even before the job announcement for the permanent position closed. **Ex. 20.**

19.    Brown never told King that she was interested in seeking employment elsewhere. .  **Ex. 1, Brown Decl., ¶ 6.**

Respectfully submitted,

HOUSTON & HOWARD

By:    *Barbara E. Brown*
Barbara E. Brown, #321091
1001 Connecticut Avenue, NW
Suite 402
Washington, D.C. 20036
(202) 628-7058